IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANCI ARMSTRONG-TEMPLE, BARBARA BRUST, and MICHELLE LOT, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF BERKELEY, ANDREW B. RATEAVER, lieutenant for the police department of the City of Berkelely, SEAN TINNEY, officer for the police department of the city of Berkeley, PETER HONG, sergeant for the police department of the City of Berkeley, SAMANTHA MARTINEZ, officer for the police department of the City of Berkeley, MATTHEW MCGEE, officer for the police department of the City of Berkeley, DARREN KACALEK, detective for the police department of the City of Berkeley, KEVIN PETERS, officer for the police department of the City of Berkeley, <br><br> Defendants. | No. C 17-06774 WHA <br><br> **ORDER RE MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this civil rights action, defendants move for summary judgment on each of plaintiffs' claims. For the reasons discussed below, defendants' motion is **GRANTED**.

**STATEMENT**

The issue is whether plaintiffs were victims of police brutality or police retaliation (for free speech) arising out of the Berkeley Police Department's removal of a homeless encampment. After receiving complaints about an encampment of around 25 homeless

individuals — a group that referred to themselves as "First They Came for the Homeless" — living on a public sidewalk in front of a home remodeling business at Fairview and Adeline Streets, defendant City of Berkeley notified the encampment's occupants that they needed to move. During the early morning hours of November 4, 2016, officers of the Berkeley Police Department held a briefing, led by defendant Lieutenant Andrew Rateaver, regarding the encampment's removal. At approximately 5:00 a.m., 18 police officers arrived at the encampment to participate in the enforcement action. Seven of those officers are sued here (Michelle Lot Dep. 49:24–57:9; Andrew Rateaver Decl. ¶¶ 4–10; Sean Tinney Decl. ¶¶ 5–7; EmilyRose Johns Decl. Exhs. C, O; Rateaver Dep. 26:15–28:11).[1]

      Plaintiff Michelle Lot lived in a tent at the encampment, as did her 26-year-old son Tanis Higgs (not a plaintiff). When the police arrived on November 4, Higgs woke up Lot and began to use a megaphone. Within five minutes, Lieutenant Rateaver and defendant Officer Darren Kacalek arrested Higgs for his use of the megaphone. When Lot came out of her tent, she saw "somebody lunging at [her] son" and she wrapped her arms around Higgs' waist. Although Lot may not have realized it at the time, the "lunging" she observed was Lieutenant Rateaver and Officer Kacalek arresting Higgs. To prevent Lot from interfering in Higgs' arrest, defendant Officer Sean Tinney grabbed the hood of Lot's sweatshirt and her hair and pulled her to the ground. Officer Tinney told Lot to "stop resisting." After about twenty seconds, Officer Tinney handcuffed Lot. Defendant Officer Matthew McGee assisted and Officers Tinney and McGee walked Lot to the jail transport van. Lot refused medical care at the time but later claimed to have suffered a torn rotator cuff as a result of the arrest (Tinney Dep. 27:10–38:10; Tinney Decl. ¶¶ 8–11; Rateaver Decl. ¶ 11; Matthew McGee Decl. ¶ 7; Lot Dep. 49:24–89:23; Rateaver Dep. 35:25–39:1; Darren Kacalek Dep. 21:5–20).

      Plaintiffs Nanci Armstrong-Temple and Barbara Brust, neither of whom were homeless, responded to calls for assistance from members of the encampment. Brust directed a non-profit and worked regularly with the homeless community. Armstrong-Temple was a candidate for

---

[1] Since the November 2016 incident, Sergeant Hong was promoted to Lieutenant, Officer McGee was promoted to Sergeant, and Lieutenant Rateaver retired from the department. This order refers to defendants by the rank they held in November 2016.

2

Berkeley's City Council and had been critical of the police and their participation in the removal of homeless encampments. Both Brust and Armstrong-Temple had been present at prior encampment removals. They went to Fairview and Adeline Streets on November 4 to help residents move their property and to observe the police's conduct (Barbara Brust Dep. 24:9–33:19; Nanci Armstrong-Temple Dep. 29:7–39:9; Brust Decl. ¶¶ 3–11; Armstrong-Temple Decl. ¶¶ 3–5).

When Brust arrived around 5:30 a.m., Armstrong-Temple was already there. With the assistance of her cane, Brust walked over to a resident's tent and checked in with Armstrong-Temple. Remaining in front of the tent, Brust began to direct the collection and storage of homeless residents' property. She also continued to criticize the City and the police for removing the encampment. At multiple points that morning, Lieutenant Rateaver approached Brust. It is clear from the video of their interaction that Lieutenant Rateaver and Brust knew each other from prior encampment removals. At one point, Brust waved her cane and yelled, "I've got a cane. I've got a weapon," but the officers had no concern that she was attempting to strike them (Tinney Dep. 41:22–47:19; Bourgault Exh. 7; Brust Decl. ¶¶ 12–18; Brust Dep. 41:14–59:1; Grant Decl. Exh. 1).

At a certain point during Berkeley's enforcement action, defendant Sergeant Peter Hong tried to pick up an unoccupied tent. Armstrong-Temple stepped on the edge of the tent so as to prevent Sergeant Hong from taking it. Despite repeated requests to do so, Armstrong-Temple refused to leave the tent and instead remained in place, all the while criticizing the City, the police and the Department of Public Works. Sergeant Hong recognized Armstrong-Temple's face from photographs in the local news and had a vague understanding that she was running for City Council (Peter Hong Decl. ¶¶ 9–11; Armstrong-Temple Dep. 51:10–54:08).

Around that same time, Brust began to use a megaphone to continue her harangue of Berkeley's actions with respect to the encampment removal. Lieutenant Rateaver claimed that Brust's loud use of the megaphone interfered with his ability to supervise the police operation. After Brust had been loudly using the megaphone for approximately three minutes, Lieutenant Rateaver walked over and put his hands on the bell of the megaphone to point it downwards.

3

1  Brust pulled the megaphone away from him and they briefly struggled over possession of the
2  megaphone. Lieutenant Rateaver held Brust's wrist and twisted her hand to remove the
3  megaphone from her hand. At the same time, he stepped on Brust's foot, causing her to lose her
4  balance and fall to the ground (Grant Decl. Exh. 1; Bourgoult Decl. Exh. 5; Brust Dep.
5  74:8–91:14; Brust Decl. ¶¶ 27–32; Rateaver Decl. ¶¶ 14–15).

6  Lieutenant Rateaver directed Brust to get up off the ground, to which Brust responded
7  that she could not because of her disability. Brust screamed at the officers not to touch her.
8  Lieutenant Rateaver and Officer Tinney then hoisted Brust to her feet and Lieutenant Rateaver
9  directed them to walk towards the police transport van. Brust explained that she needed her
10 cane but did not receive it. Defendant Officer Samantha Martinez grabbed Brust's left arm and
11 tugged Brust towards the van, at one point causing Brust to stumble. Officer Tinney decided to
12 not provide Brust with her cane and instead grabbed her feet. Lieutenant Rateaver and Officers
13 Tinney and Martinez then carried Brust to the van. As they carried her, Brust's sweatshirt lifted
14 up and exposed her breast. After Brust yelled that she was "exposed," Officer Martinez and
15 Officer Paula Hammonds assisted by pulling down Brust's shirt. Brust sometimes wore a knee
16 brace during the time frame surrounding the November 2016 incident, but she did not have it on
17 that morning. She had arthritis and lacked cartilage in her knees. Falling to the ground and
18 being carried by the officers caused her considerable pain. Following the November 2016
19 incident, moreover, Brust required a total knee replacement on both knees (Grant Decl. Exh. 1;
20 Bourgoult Exh. 5; Samantha Martinez Decl. ¶¶ 6–11; Martinez Dep. 33:13–18; Rateaver Decl.
21 ¶¶ 16–20; Tinney Decl. ¶¶ 19–21; Brust Dep. 91:14–119:24).

22 When Armstrong-Temple observed police carrying Brust towards the police van, she ran
23 over and ultimately blocked the van's doorway. Officer Collins, who was inside the van, tried
24 to push Armstrong-Temple out of the doorway without success. Sergeant Hong, Officer
25 Tinney, and defendant Officer Kevin Peters then grabbed Armstrong-Temple's arms, pulled her
26 down from the doorway onto the ground, and dragged her to a spot a couple of feet away.
27 Sergeant Hong directed her to "roll over," to "stop resisting," and to put her hands behind her
28 back. Armstrong-Temple responded by stating, "I am disabled, you cannot cuff me." Officer

Peters placed a handcuff on Armstrong-Temple's left arm, but she refused to put her right arm behind her back. After many ignored requests, the officers moved Armstrong-Temple's right arm behind her back and completed the handcuffing (Armstrong-Temple Dep. 62:22–120:12; Tinney Decl. ¶¶ 22–23; Hong Decl. ¶¶ 12–20; Peters Decl. ¶¶ 6–7; Kelly Decl. Exh. 3; McGee Decl. ¶¶ 10–15).

After placing Armstrong-Temple in handcuffs, the officers requested that she stand up. She refused and stated, "The moment of oppression is the moment to resist." Four officers lifted and carried Armstrong-Temple to the jail van. When Armstrong-Temple began yelling, "they are ripping my arms out of my sockets," the officers set her down and asked her to walk on her own. She again refused. The officers lifted her again and placed her in the jail van (Armstrong-Temple Dep. 120:12–136:22; McGee Decl. ¶¶ 16–18; Peters Decl. ¶ 8; Hong Decl. ¶ 21; Kacalek Decl. ¶¶ 11–12).

\*          \*          \*

Plaintiffs filed this action against defendants in November 2017. They filed an amended complaint asserting claims under state and federal law in March 2018, which complaint defendants answered. Defendants now move for summary judgment on all of plaintiffs' claims (Dkt. Nos. 1, 35, 41, 61). This order follows full briefing and oral argument.[2]

## ANALYSIS

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[3]

---

[2] Because defendants took advantage of additional pages on reply, their request to strike plaintiffs' opposition brief for exceeding the applicable page limits is **DENIED**.

[3] Plaintiffs concede that their state-law false arrest claim and their claims against Officer Kacalek are subject to summary judgment and should be dismissed.

5

1. **EXCESSIVE FORCE.**

Police violate the Fourth Amendment if they use force that is not objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Courts assess reasonableness by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (internal quotation marks omitted). To evaluate the nature and quality of the intrusion, courts consider the "type and amount of force inflicted." *Young v. Cnty of L.A.*, 655 F.3d 1156, 1161 (9th Cir. 2011). When evaluating the government's interest, in turn, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. This inquiry must be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ibid*. Courts may also consider the severity of injuries in evaluating the amount of force used and may infer from the minor nature of a plaintiff's injuries that the force applied was minimal. *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018). In this case, no weapons or batons or chokeholds were used. No one was punched.

    A. **Plaintiff Lot.**

Lot argues that Officer Tinney used excessive force in arresting her. While some factual disputes remain regarding Lot's arrest, none are material. Lot admits that she wrapped her arms around her son's waist as the officers approached to arrest him. She further concedes that Officer Tinney had probable cause to arrest her for violating Section 148 of the California Penal Code, which makes it a misdemeanor to "willfully resist[], delay[], or obstruct[] any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment." To prevent Lot's further interference in the arrest of Higgs, Officer Tinney performed a takedown by grabbing the hood of her sweatshirt and some of her hair and pulling her away from the officers, causing Lot and Officer Tinney to stumble to the ground. As explained by defendants' expert, this takedown was a trained technique that was POST and departmentally approved.

Once on the ground, Lot could feel pressure on her head and neck, "which [she] thought was a knee because of the way it felt, but it could have been a hand." Officer Tinney, meanwhile, states that he kneeled with his weight on the ground and used one of his arms and one of Lot's arms to try and keep her stomach on the ground so that he could handcuff her. Officer Tinney's account is supported by the video that captured part of Lot's arrest. And, Lot's claim that she "did not struggle or resist" is plainly contradicted by the video, in which Lot can be heard screaming at the officers to remove their hands from her head and can later be seen struggling as the officers attempt to adjust her handcuffs. Moreover, the minor nature of Lot's injuries indicates that Officer Tinney applied only minimal force. Lot explains that she experienced pain in her right elbow, hip and knee, and that she sustained an injury to her rotator cuff, yet she refused medical care upon her arrest and did not truly seek medical care until nearly two years later (Tinney Dep. 27:10–36:3; Lot Dep. 80:10–113:21; Lot Decl. ¶¶ 11–15; Tinney Decl. ¶¶ 8–10; Kelly Decl. Exh. 1; Cameron Decl. Exh. 1).

Even accepting Lot's evidence as true and making all justifiable inferences in her favor, a reasonable juror applying the *Graham* analysis could not find that Officers Tinney's use of force was unreasonable. He was entitled to use the minimal force he did in order to prevent Lot's physical interference with the arrest of Higgs. Defendants' motion for summary judgment on Lot's excessive-force claim is therefore **GRANTED**.

### B. Plaintiff Brust.

Taking Brust's facts as true and making all justifiable inferences in her favor, as this order must on summary judgment, the following story is presented. Earlier that morning, Brust held her cane between Lieutenant Rateaver and a tent to block his movement. She later raised her cane above her head and yelled, "I've got a cane. I've got a weapon." Once on the megaphone, she yelled, "I am not able to control my anger right now!" After she used the megaphone for about three minutes, she physically resisted when Lieutenant Rateaver approached her, angled the bullhorn down to indicate that she should stop using it, and tried to take the bullhorn away from her. At this point, the officers had probable cause to arrest Brust for violating Section 148 of the Penal Code. Lieutenant Rateaver then stepped on her foot,

7

twisted her thumb, and pulled the megaphone towards his body, causing her to fall to the ground. As he tried to help her up, she screamed at him not to touch her. After the officers pulled her to her feet, Officer Martinez and Lieutenant Rateaver held Brust's arms and directed her towards the transport van. When Brust had trouble walking, Officer Tinney decided to pick up Brust's legs and carry her to the police van rather than provide her with her cane (Rateaver Decl. ¶¶ 12–19; Brust Decl. ¶¶ 15–37; Grant Decl. Exh. 1; Martinez Decl. ¶¶ 6–9; Tinney Decl. ¶¶ 14–23).

No reasonable juror could evaluate the circumstances of this encounter and conclude that any of the officers' conduct amounted to objectively unreasonable force. As the video demonstrates, the force was minimal and resulted from Brust's resistance and refusal to turn over the bullhorn. Defendants' motion for summary judgment on Brust's excessive-force claim is accordingly **GRANTED**.

### C. Plaintiff Armstrong-Temple.

Taking Armstrong-Temple's facts as true, except to the extent "blatantly contradicted by the record, so that no reasonable jury could believe it," *Scott v. Harris*, 550 U.S. 372, 380 (2007), and making all justifiable inferences in her favor, summary judgment is appropriate on her excessive-force claim. When Armstrong-Temple saw the officers carrying Brust, she ran over and yelled, "What the hell are you doing?" She later said, "You can't take Barbara," ran to the transport van, and blocked the doorway so that the officers could not place Brust inside. As Armstrong-Temple herself put it, she "block[ed]" Sergeant Hong "from taking an elderly, disabled person into a van." When the officers tried to grab hold of her arms, she resisted and said, "You will not take me." The officers pulled her down to the ground and away from the doorway of the van. When the officers attempted to handcuff her, she refused to place her right arm behind her back. After the officers finally managed to cuff her, she went limp and refused to stand. Ultimately, after she repeatedly ignored the officers' requests, they lifted her up and carried her to the transport van (Armstrong-Temple Dep. 62:22–136:22; Hong Decl. ¶¶ 12–21; Tinney Decl. ¶¶ 22–23; Kelly Decl. Exh. 2; Armstrong-Temple Decl. ¶¶ 9–24).

The video recording conclusively establishes that the officers' conduct did not amount to excessive force. Rather, the officers acted reasonably so as to prevent Armstrong-Temple's further interference with Brust's arrest and placement into the police van. Defendants' motion for summary judgment on Armstrong-Temple's excessive-force claim is therefore **GRANTED**.

### 2. FIRST AMENDMENT RETALIATORY ARREST.

Defendants arrested all three plaintiffs for violating Section 148 of the California Penal Code. Plaintiffs Brust and Armstrong-Temple claim that defendants arrested them in retaliation for their speech in violation of the First Amendment.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation omitted). "In order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that 'by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.'" *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (citation omitted). A plaintiff must "prove the elements of retaliatory animus as the cause of injury," with causation being "understood to be but-for causation." *Hartman*, 547 U.S. at 260.

The intent to inhibit speech can be demonstrated either through direct or circumstantial evidence. *Mendocino Envtl. Ctr.*, 192 F.3d at 1300–01. Plaintiffs concede that defendants had probable cause to arrest them under Section 148 of the California Penal Code. Nevertheless, our court of appeals has made clear that "probable cause to arrest [the plaintiff] does not necessarily mean that booking and jailing him was constitutional." *Ford v. City of Yakima*, 706 F.3d 1188, 1194 (9th Cir. 2013). Courts instead look to the circumstances surrounding the arrest to determine whether or not retaliatory animus was the cause, including the temporal proximity between the protected speech and the allegedly retaliatory act. *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003).

Here, Lieutenant Rateaver's arrest of Brust followed her ongoing criticisms of the police's removal of the encampment. The arrest did not occur, however, until she physically

9

resisted Lieutenant Rateaver's attempts to take away the megaphone (as it drowned out police commands and verbal communications). Notably, several individuals criticized the police without incident that morning but all who used the megaphone for more than five seconds were arrested. Similarly, despite Armstrong-Temple's criticisms of the police throughout the morning, Sergeant Hong did not arrest her until (as Armstrong-Temple herself admits) she physically blocked the door of the police van to prevent the officers from placing Brust inside. Although Sergeant Hong acknowledged that he recognized Armstrong-Temple as a candidate for City Council, plaintiffs point to no evidence to contradict Sergeant Hong's testimony that he did not have familiarity with the substance of her policy positions. Even viewing these facts in the light most favorable to plaintiffs, this order finds there is no triable issue of fact as to whether Lieutenant Rateaver or Sergeant Hong arrested Brust and Armstrong-Temple in retaliation for their speech. Defendants' summary judgment motion on plaintiffs' First Amendment retaliation claim is **GRANTED**.

### 3. BATTERY.

"A police officer who uses more force than is reasonably necessary to effect a lawful arrest commits a battery upon the person arrested as to such excessive force." *Ting v. United States*, 927 F.2d 1504, 1514 (9th Cir. 1991) (citation omitted). As stated above, the officers here used reasonable force. Defendants' motion for summary judgment as to plaintiffs' battery claim is accordingly **GRANTED**.

### 4. AMERICANS WITH DISABILITIES ACT.

Brust asserts an ADA claim against Lieutenant Rateaver, Officer Tinney, and Officer Martinez in their individual capacities based on their refusal to allow Brust to use her cane during her detention and arrest and their decision to carry her to the police transport van. As plaintiffs do not dispute, however, the ADA does not authorize claims against government employees in their individual capacities. *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002); *Hayes v. Voong*, 709 Fed. Appx. 494, 495 (9th Cir. 2018). Defendants' motion for summary judgment on Brust's ADA claim is accordingly **GRANTED**.

### 5. BANE ACT.

California's Bane Act provides a civil remedy for persons whose exercise of constitutional rights have been interfered with by "threats, intimidation, or coercion." Cal. Civ. Code § 52.1. Plaintiffs' claim under the Bane Act depends on whether the defendants' conduct violated plaintiffs' Fourth or First Amendment rights, and for the reasons set forth above, it did not. Absent any constitutional violation, there is no basis for a claim of liability under the Bane Act. *See Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013). Defendants' motion for summary judgment as to plaintiffs' Bane Act claim is accordingly **GRANTED**.

### 6. NEGLIGENCE.

"[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (citations omitted). Police officers have a duty to act reasonably when using force, but the reasonableness of an officer's actions must be determined in light of the totality of the circumstances. *Ibid.* Because a reasonable jury could not find that the officers acted unreasonably in their use of force against plaintiffs, defendants' motion for summary judgment on plaintiffs' negligence claim is **GRANTED**.

### 7. *MONELL* CLAIM.

For a municipality to be liable under Section 1983, there must have been an unconstitutional action taken due to governmental custom, or to implement or execute a policy, regulation or decision adopted by the municipality. A municipality cannot be held liable merely because it employs a tortfeasor. *Monell v. Dep't of Soc. Srvcs. of N.Y.*, 436 U.S. 658, 690–91 (1978). It may, however, be held liable if it is "obvious" that specific employees need "more or different training" and that the failure to do so was "so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

Here, plaintiffs allege that the officers' failure to properly document their use of force during the November 2016 removal evinces Berkeley's deliberate indifference to its officers'

11

unlawful use of force. Plaintiffs have failed, however, to provide factual support for this claim. An individual incident of unconstitutional action by a small group of non-policymaking employees is insufficient to establish *Monell* liability. *See McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000). Because plaintiffs have, at most, demonstrated a triable issue as to whether the individual defendants failed to properly document their use of force on a single occasion, plaintiffs have not raised a genuine issue of material fact that the officers' conduct was pursuant to an unconstitutional "policy or custom." Defendants' motion for summary judgment on plaintiffs' *Monnell* claim is **GRANTED**.

### 8. EVIDENTIARY OBJECTIONS.

The parties raise multiple evidentiary objections. *First*, defendants object to Lot's statement in her declaration that she "heard later that there were eight officers on [her] and [her] son" as inadmissible hearsay. Because the statement is offered for the truth of the matter asserted and no exception to the hearsay rule applies, the objection is **SUSTAINED**.

*Second*, plaintiffs object to the report of defendants' expert, Don Cameron, on the ground that the report includes legal opinions and fails to evaluate the facts in the light most favorable to plaintiffs. Because this order relies on Cameron's report only for the limited proposition that Officer Tinney's takedown maneuver was a trained technique that was POST and departmentally approved, the objection is **OVERRULED**.

*Third*, defendants object to several paragraphs of Brust's declaration and to various exhibits attached to the declaration of Attorney EmilyRose Johns. Because considering this evidence would not alter the outcome of this order, these objections are **OVERRULED AS MOOT**.

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is **GRANTED**. No claims remain in this case. Judgment will be entered separately.

**IT IS SO ORDERED.**

Dated: April 16, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

12